UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ICONIX BRAND GROUP, INC.,<br><br>Defendant. | COMPLAINT<br><br>Civil Action No. 19-CV-11150<br>ECF CASE<br>(Jury Trial Demanded) |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its

Complaint against defendant Iconix Brand Group, Inc. ("Iconix"), alleges as follows:

## OVERVIEW

1.     This action concerns an intentional fraud perpetrated by Iconix Brand Group, Inc.

("Iconix"), through its former senior management, to recognize false revenue and manipulate

reported earnings in 2014.  This action also concerns Iconix's negligence-based accounting and

reporting fraud, between 2013 and the third quarter of 2015, in failing to: (i) write off two

licensees' uncollectible receivables; and (ii) impair the amount of certain intellectual property

assets related to three brands, despite clear indicators of impairment.  Finally, the action concerns

Iconix's improper accounting and reporting in connection with these transactions, as well as the

deficient internal accounting policies and procedures that resulted in Iconix's improper conduct.

2.     Central to this action is an intentional fraud perpetrated by Iconix, through its

former senior management, to recognize false revenue and manipulate reported earnings through

transactions with a joint-venture partner—referred to herein as "Company 1"—that were

recorded at artificially inflated purchase prices.  The transactions—which were knowingly

entered into and structured at the direction of Iconix's then-Chief Executive Officer ("CEO") and

carried out by Iconix's then-Chief Operating Officer ("COO")—involved a scheme to sell intellectual property rights to Company 1 at artificially inflated purchase prices and return a portion of the purchase price to Company 1.  The transactions with Company 1 enabled Iconix to fraudulently recognize $11 million in false revenue in 2014, creating the materially false appearance that Iconix beat analysts' revenue expectations for two quarters in 2014 and that Iconix beat analysts' annual revenue and earnings expectations for 2014.

3.      In addition, between 2013 and the third quarter of 2015, Iconix engaged in a negligent accounting and reporting fraud by failing to write off receivables due from two licensees—referred to herein as "Company 2" and "Company 3"—as uncollectible.  Instead, Iconix entered into transactions that misleadingly concealed the licensees' distressed financial condition and then improperly accounted for and reported those transactions.  As a result of its unreasonable failure to write off the Company 2 and Company 3 receivables as uncollectible in 2013, Iconix materially overstated net income derived from Company 2 by over $5 million and from Company 3 by over $9 million.

4.      Between 2013 and the third quarter of 2015, Iconix also unreasonably failed to recognize an impairment loss on intellectual property assets associated with three brands— referred to herein as "Brand 1," "Brand 2," and "Brand 3"—despite the presence of clear indicators of impairment.  Instead, Iconix entered into a number of transactions that propped up the distressed brands and helped to conceal from investors the brands' distressed financial condition.  Iconix improperly accounted for and reported these transactions in connection with its 2013 and 2014 impairment testing, including by using royalty revenue projections to calculate purported fair values for the three brands that bore no relation to historical and expected future performance and were therefore unreasonable.

2

5.      As a result of its unreasonable failure to impair these assets, on its 2013 balance

sheet, Iconix carried Brand 1 and Brand 2 at $202.7 million and $176.7 million, respectively,

during a period of time when their true fair market value was approximately $60 million to $70

million, each—overstating the amount of Brand 1 by approximately $132.7 to $142.7 million

and the amount of Brand 2 by $106.7 to $116.7 million.  Iconix unreasonably carried Brand 3 at

an amount of approximately $9.5 million, when its true fair market value was approximately $1

million, for an overstatement of value by approximately $8.5 million.  In 2014, even though the

brands remained impaired and despite the continued presence of indicators of impairment, Iconix

continued to fail to impair these intangible assets, resulting in continued material misstatements

in its accounting for and reporting of these assets by hundreds of millions of dollars.

6.      By engaging in the misconduct described herein, Iconix violated the antifraud,

reporting, books and records, and internal accounting control provisions of the Securities

Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act").

7.      Iconix will continue to violate the federal securities laws unless restrained or

enjoined by this Court.

8.      The SEC seeks injunctive relief, civil penalties, and other appropriate and

necessary equitable relief.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15

U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

10.     Venue is proper in this Court pursuant to Section 22(a) and (c) of the Securities

Act [15 U.S.C. § 77v(a), (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. §

78aa(a), (b)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the Southern District of New York.

11.     Iconix, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANT

**12.     Iconix Brand Group, Inc. ("Iconix")**, is a publicly-traded company incorporated in Delaware and headquartered in Manhattan.  Iconix has a class of shares registered under Section 12(b) of the Exchange Act, and its common stock trades on the Nasdaq Global Market under the symbol "ICON."  Iconix's predecessor company, Candie's Inc. ("Candie's"), was previously charged by the SEC in two actions.  In 2003, the SEC charged Candie's with violating Exchange Act Section 10(b) for fraudulent recognition of revenue through the use of improper bill-and-holds and artificial inflation of revenue by entering into illusory sales transactions with a barter company.[1]  In 1996, the SEC charged Candie's with violating Securities Act Section 5 [15 U.S.C. § 77(e)] in connection with a scheme to evade the registration requirements with respect to four offerings.[2]

## RELEVANT INDIVIDUALS

13.     The following individuals, relevant to this action, have been charged by the SEC in separate actions and proceedings:

---

[1]  *See Candie's Inc.*, Securities Act Release No. 8228 (Apr. 30, 2003), *available at* https://www-test.sec.gov/litigation/admin/33-8228.htm.

[2]  *Candie's Inc*., Securities Act Release No. 7263 (Feb. 21, 1996), *available at* https://www.sec.gov/litigation/admin/3436865.txt..

a. **Neil R. Cole**, age 62, resides in New York, New York.  Cole served as the CEO of Iconix and its predecessor company, Candie's, from 1991 until August 2015, when he left the company during the course of its internal investigation into allegations of misconduct.

b. **Seth Horowitz**, age 43, resides in New York, New York.  Horowitz joined Iconix in 2012 and served as Iconix's COO from March 2014 until he resigned in mid-April 2015.

c. **Warren Clamen**, age 55, resides in Accord, New York.  Clamen is a CPA licensed in Maine and Quebec, Canada.  Clamen served as Iconix's Chief Financial Officer ("CFO") from March 2005 until March 2014, when he resigned from the company.

## FACTUAL ALLEGATIONS

### I. BACKGROUND

14.  Iconix is a brand management company, which purchases and owns a portfolio of consumer brands across the fashion, sports, and home industries.  Iconix engages in licensing, marketing, and providing trend direction for its brand portfolio and, at its peak, held over 1,100 licenses with retailers and manufacturers worldwide.

15.  Iconix has referred to its business model as "asset light."  Under its stated business model, Iconix owns brand trademarks and related intangible assets, but leaves design, manufacturing, distribution, warehousing, and retailing to its licensees, which pay royalties and other fees to Iconix for the right to use the Iconix brand names.

16.  During the relevant period, Iconix's core licensees included companies that maintained high-profile associations with celebrities.

17.     Beginning as early as 2011, certain of Iconix's core licensees experienced significant financial distress due to a loss of customer demand for the brands that they licensed from Iconix and an inability to sell branded merchandise.

18.     By 2013, certain of Iconix's licensees were delinquent in their royalty payment obligations to Iconix, and at least one licensee was on the verge of bankruptcy.

19.     The inability of Iconix's licensees to sell products associated with the brands and to make royalty payments negatively impacted Iconix's ability to continue to recognize royalty revenues and to maintain previously recorded accounts receivable as assets.

20.     In turn, this negatively impacted Iconix's ability to meet earnings estimates, as well as its ability to continue to recognize the intellectual property assets as unimpaired.

## II.     GOVERNING ACCOUNTING PRINCIPLES, STANDARDS, AND PROCEDURES

21.     As a U.S. public company, Iconix is required to report its financial results for each quarter and, on an annual basis, to report its results for the full year.  During the relevant period of 2013 through the third quarter of 2015, Iconix's practice was to issue a press release soon after the end of each quarter announcing financial results, which it would file with the SEC on the SEC's online EDGAR system.  Shortly thereafter, Iconix would also report its financial results on a Form 10-Q, which it filed on the SEC's EDGAR system.  Iconix also prepared an annual report and annual financial statements, which it filed on Form 10-K on the SEC's EDGAR system.  In addition to making these filings available to the public on EDGAR, Iconix would make them available on Iconix's website.

22.     As a U.S. public company, Iconix is required by the SEC to comply with Generally Accepted Accounting Principles, or "GAAP," in compiling and filing its annual and interim financial statements with the SEC.

23.     GAAP is a series of authoritative standards (set out by policy boards, including the Financial Accounting Standards Board, or "FASB") that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.  This makes it easier for investors to analyze and extract useful information from the company's financial statements and facilitates the comparison of financial information across different companies.

24.     FASB's Accounting Standards Codification ("ASC") is the current source of U.S. GAAP.

25.     One of the financial results that Iconix announced each quarter was revenue. ASC 605, *Revenue Recognition*, provides, in relevant part, guidance for transaction-specific revenue recognition and certain matters related to revenue-generating activities, such as the sale of products and rendering of services.  Pursuant to ASC 605, revenue is recognized when it is realized or realizable and earned.  In addition, ASC 605 provides guidance for: (i) arrangements under which a vendor will provide multiple deliverables to a customer; (ii) reporting revenue gross or net of certain amounts paid to others; (iii) accounting for consideration given by a vendor to a customer; and (iv) the use of the milestone method in arrangements that include research or development deliverables.

26.     Pursuant to and consistent with ASC 605's guidance that revenue should not be recognized until it is realized or realizable and earned, Iconix's revenue recognition policy set forth four requirements that generally must be met before revenue can be realized and earned: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iii) collectability is reasonably assured.

27.     Iconix also announced its earnings per share each quarter.  Iconix reported its "Basic EPS," a GAAP measure, which is computed by dividing net income by the weighted average number of common shares outstanding for the reporting period.  In its quarterly earnings press releases, Iconix also reported "non-GAAP diluted earnings per share" (hereinafter "EPS"), a non-GAAP measure that involves making certain adjustments to net income and counting stock options and the like toward the total of shares outstanding.

28.     Another financial result that Iconix reported quarterly was the amount of its accounts receivable.  Under ASC 310, "[a]n impairment of receivables shall be recognized when, based on all available information, it is probable that a loss has been incurred based on past events and conditions existing at the date of the financial statements."  ASC 310-35-8, subtopic 450-20, requires recognition of a loss when both of the following conditions are met: (i) available information indicates that it is probable that a receivable has been impaired; and (ii) the amount of the loss can be reasonably estimated.

29.     Iconix was also required by GAAP to test its indefinite-lived intangible assets for impairment at least annually.  ASC 350, *Intangibles – Goodwill and Other*, requires companies to test their intangible assets for impairment if events or changes in circumstances indicate that the assets might be impaired.  This includes testing the assets for impairment more frequently, if certain "triggering events" or indicators of impairment occur, such as adverse changes in the business climate or market that might negatively impact value of an intangible asset.  In addition, companies must also perform annual tests for impairment for indefinite-lived intangible assets.

Under ASC 350's impairment test, the fair value[3] of an intangible asset must be compared to its carrying amount (book value).  If the fair value of the intangible asset is greater than its carrying amount, then no impairment is deemed to exist.  If the fair value of the intangible asset is less than its carrying amount, then the intangible asset is considered to be impaired and an impairment loss shall be recognized in an amount equal to that excess.

30.    Iconix was also required under GAAP to disclose transactions with related parties. Under ASC 850, *Related-Party Disclosures*, financial statements are required to disclose material related-party transactions other than compensation arrangements, expense allowances, or other similar items that occur in the ordinary course of business.  If the financial position or results of operations of the reporting entity could change significantly because of common control or common management, then disclosure of the nature of the ownership or management control is required, even if there were no transactions between the entities.  A description of transactions and the effects of those transactions reflected in the financial statements for each period for which an income statement is presented.  ASC 850-10-20(b) specifies that related parties include entities required to be accounted for by the equity method, and ASC 850-10-50-1 states that "[f]inancial statements shall include disclosures of material related party transactions." Rule 4-08(k) of Regulation S-X [17 C.F.R. § 210.4-08], *Related Party Transactions that Affect the Financial Statements*, provides that:  (i) amounts of related party transactions should be stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows; and (ii) in cases where separate financial statements are presented for the registrant,

---

[3] ASC 820, *Fair Value Measurements and* Disclosures, defines "fair value" as the price that would be received to sell an asset or to transfer a liability in an orderly transaction between market participants at the measurement date.

certain investees, or subsidiaries, any intercompany profits or losses resulting from transactions with related parties and the effects thereof shall be disclosed.

31.     During the relevant period, Iconix reported that it used the equity method of accounting to account for those investments and joint ventures which are not required to be consolidated under U.S. GAAP.  ASC 323, *Investments – Equity Method and Joint Ventures*, comprises three subtopics: Overall; Partnerships, Joint Ventures and Limited Liability Entities; and Income Taxes.  ASC 323-10, *Overall*, provides guidance on the application of the equity method of accounting to investments within the subtopic's scope, and notes that the equity method is an appropriate means of recognizing increases or decreases measured by GAAP in the economic resources underlying the investments, and that the equity method best enables investors in corporate joint ventures to reflect the underlying nature of their investment in those ventures.  ASC 323-30, *Partnerships, Joint Ventures, and Limited Liability Entities*, discusses specific guidance on applying the equity method of accounting to investments in partnerships, unincorporated joint ventures, and limited liability companies.

## III.   ICONIX KNOWINGLY OR RECKLESSLY ENGAGED IN A FRAUDULENT SCHEME TO RECOGNIZE FALSE REVENUE AND MANIPULATE EARNINGS

32.     Iconix knowingly or recklessly violated the antifraud, reporting, and books and records provisions of the federal securities laws through transactions with a joint-venture partner orchestrated to recognize false revenue and manipulate earnings in 2014.

33.     Iconix's scheme was simple.  Iconix—through its then-CEO—negotiated with a joint-venture partner—Company 1, a brand management company headquartered in Asia and with offices in New York—to artificially inflate the price that Company 1 would pay to Iconix for intellectual property assets.  Iconix—through its then-CEO—promised (in secret, verbal side

deals) to give the overpayments back to Company 1 at a later date and find a way to paper over these givebacks so that they would look legitimate.  A $5 million overpayment in the second quarter of 2014 and a $6 million overpayment in the third quarter of 2014—neither of which should have been recognized as revenue in light of Iconix's promise to give the funds back— enabled Iconix to beat Wall Street analysts' consensus estimates for revenue in each quarter, and enabled Iconix to beat Wall Street expectations for revenue and a key earnings per share metric when Iconix reported its annual results for 2014.

A.     **Iconix's Attention to Consensus Estimates**

34.     During the relevant period, multiple securities analysts covered Iconix.  Each quarter, these analysts would estimate what Iconix would report for quarterly revenue and EPS. The analysts' quarterly estimates, taken together, formed the "consensus estimate" for Iconix.

35.     Iconix paid close attention to how its performance compared to these consensus estimates.  Throughout 2014, Iconix's then-CEO and then-COO regularly received and reviewed financial forecast documents, which set out Iconix's actual projected financial results for the current quarter.  Iconix compared these projected results to the consensus estimates for revenue and EPS.  The financial forecasts also identified potential revenue from joint-venture initiatives under consideration by Iconix in each quarter and calculated the contribution that each joint-venture initiative would make toward Iconix's meeting or beating consensus estimates.

36.     Under its routine method for accounting for its joint-venture activities in its books and records, Iconix would immediately book as revenue the full amount of any asset sales to joint-venture partners, less Iconix's cost basis in the assets, as long as Iconix received at least 20% of the purchase price at the time of the transaction.

B.        **The SEA II Transaction with Company 1**

37.       In the third quarter of 2013, Iconix formed a joint venture with Company 1 to distribute Iconix-branded merchandise in Southeast Asia.  The joint venture with Company 1 was known within Iconix as the "Southeast Asia" or "SEA" joint venture.

38.       In the second quarter of 2014, Iconix knew—based on financial forecasts that Iconix's then-CEO and then-COO regularly reviewed—that it was not on track to meet consensus estimates.

39.       To bump up revenue and EPS in the second quarter of 2014, Iconix considered several initiatives involving sales of Iconix intellectual property, one of which was to amend the SEA joint venture and sell intellectual property rights to Company 1.

40.       Iconix and Company 1 discussed a $10.9 million purchase price for the contemplated asset sale, reflecting the property's fair market value, and prepared deal documentation at that price.

41.       The financial forecast documents reviewed by Iconix's then-CEO and then-COO showed that the revenue that Iconix would receive from selling intellectual property to Company 1 for $10.9 million would not be sufficient for Iconix to meet consensus revenue estimates.

42.       Iconix, through its then-CEO, determined and instructed that the purchase price must be increased by $5 million, to $15.9 million.  Iconix's then-CEO negotiated the deal with Company 1's executives, including an increase to the purchase price of $5 million.  Iconix, through its then-CEO, promised Company 1 that if Company 1 paid $15.9 million for $10.9 million-worth of intellectual property, then Iconix would return the $5 million overpayment to Company 1 at a later time.

43.     After Iconix promised to return the $5 million overpayment to Company 1, Company 1 agreed to a final purchase price of $15.9 million.  Iconix updated the deal documents to reflect a purchase price of $15.9 million.  Because the substance of the deal had not otherwise changed, no other terms changed.

44.     This deal, referred to internally at Iconix as "SEA II," was finalized on June 30, 2014, the last day of the second quarter.  At the time the deal closed, Company 1 paid Iconix $4 million—25% of the inflated $15.9 million purchase price.

### 1.     Iconix's Material Accounting Errors for SEA II

45.     Iconix recognized a second quarter gain of $13.6 million on SEA II, representing the difference between the consideration received and the book value of Iconix's interest in the brands contributed to the joint venture.  Iconix's recognition of $5 million of the $13.6 million amount was improper, because Iconix had promised to return this amount to Company 1 via a round-trip.  Consequently, under the relevant accounting standards and Iconix's internal accounting policies and procedures, it was not permissible for Iconix to recognize the $5 million overpayment as revenue.

### 2.     Iconix's Materially False and Misleading Disclosures Concerning SEA II

46.     On July 29, 2014, Iconix issued a press release, entitled "Iconix Brand Group Reports Record Revenue and Earnings for the Second Quarter of 2014," in which it announced its second quarter results.  Iconix filed the press release with the SEC as an exhibit to a Form 8-K.  Iconix's press release and Form 8-K contained materially false and misleading statements about Iconix's second quarter financial results.  Iconix touted "Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75."  The revenue figure was false, because it had been materially inflated due to the $5 million overpayment.  The press release also reported non-

GAAP diluted EPS of $0.75, beating the consensus estimate of $0.67 by eight cents per share.  If the false revenue from the SEA II deal had been excluded, then Iconix would have reported EPS of $0.69 per share, only two cents over consensus.

47.    Iconix's Form 10-Q, filed with the SEC on or about August 6, 2014, also contained materially false and misleading statements about the SEA II transaction.  Iconix's Form 10-Q falsely reported revenue of over $118.9 million for the quarter.  The consensus revenue estimate for Iconix was just over $117 million, meaning that because of the $5 million in false revenue from the SEA II transaction, Iconix beat the analysts' consensus estimate by $1.86 million.  If Iconix had properly excluded the $5 million SEA II giveback from its Form 10-Q financial results, then it would have reported revenue of $113.9 million—falling short of the consensus estimate by over $3.1 million.  Iconix's Form 10-Q overstated reported revenue by 4.4%.

48.    Iconix's Form 10-Q reported net income after taxes for the quarter of $38.782 million.  If Iconix had properly excluded the $5 million in false revenue from its reported financial results, then it would have reported actual net income of approximately $36.379 million.  Iconix's reported net income was materially misstated by over 9%.

49.    Iconix's Form 10-Q also described the intellectual property rights transferred to the SEA joint venture as part of the SEA II deal, and claimed that: "[i]n return, [Company 1] agreed to pay [Iconix] $15.9 million."  This was misleading, because Iconix failed to disclose that Company 1 paid only $10.9 million as consideration for the intellectual property rights, with $5 million representing an agreed-upon overpayment—lacking in economic substance—that Iconix, through its then-CEO, had promised to give back to Company 1.

50.     Iconix repeated this materially false and misleading statement in its annual report filed with the SEC on Form 10-K on March 2, 2015 and in its Form 10-Q for the first quarter of 2015, filed with the SEC on May 8, 2015.

### C.     The SEA III Transaction with Company 1

51.     In the third quarter of 2014, which ended on September 30, it appeared as though Iconix would miss its targets for revenue and earnings.

52.     Iconix's then-CEO and then-COO again considered potential joint-venture initiatives as a means to realize one-time gains and hit financial metrics.  One of the joint-venture initiatives considered was the sale of additional intellectual property rights to Company 1.  This transaction, referred to by some within Iconix as "SEA III," resulted in a second amendment to the SEA joint-venture agreement.

53.     Iconix and Company 1 discussed a deal in which Company 1 would pay Iconix $15.5 million for the intellectual property assets.  Iconix's then-CEO determined that the purchase price must be increased by $6 million, to $21.5 million, in order for Iconix to beat its consensus revenue estimate.

54.     In a verbal side deal, Iconix's then-CEO promised that if Company 1 overpaid for the intellectual property assets by $6 million, then Iconix would return $6 million to Company 1.

55.     Iconix, through its then-CEO and then-COO, and executives at Company 1 discussed ways that Iconix could give back $6 million, one of which was to allow Company 1 to prematurely terminate a license with Iconix to sell children's apparel, reducing the royalty fees due to Iconix from Company 1.

56.     Iconix finalized the deal documents, which reflected the $21.5 million purchase price, but did not reflect Iconix's promise to give back $6 million to Company 1.  That promise was never reduced to a written agreement.

57.     The SEA III transaction was executed on September 17, 2014.  At the time the deal closed, Company 1 paid Iconix $4.3 million—20% of the inflated purchase price.

### 1.     *Iconix's Material Accounting Errors for the SEA III Transaction*

58.     On or about September 30, 2014, Iconix recorded an $18.7 million gain on the SEA III transaction, representing the difference between the $21.5 million purchase price and the book value of Iconix's interest in the intellectual property assets contributed to the joint venture.

59.     Six million of this gain was improperly recognized under GAAP and Iconix's internal accounting policies and procedures, because Iconix had promised to return this amount to Company 1 via a round-trip.

### 2.     *Iconix's Materially False and Misleading Disclosures Concerning SEA III*

60.     On October 28, 2014, Iconix issued a press release announcing its third quarter financial results.  Iconix filed the press release with the SEC as an exhibit to a Form 8-K on October 29, 2014.

61.     Iconix's press release contained materially false and misleading statements.  The press release touted that Iconix had achieved "[r]ecord Q3 diluted non-GAAP EPS of $0.73, a 23% increase over prior year quarter."  This was materially false and misleading, because the EPS metric had been artificially inflated by the improperly recognized revenue from the SEA III transaction.  By falsely reporting non-GAAP diluted EPS at $0.73, Iconix falsely reported it beat the consensus estimate of $0.63 by ten cents.  If Iconix had properly excluded the effect of the false $6 million in revenue from its EPS calculation, then its non-GAAP diluted EPS would have

been $0.65 cents—only two cents over the consensus—and not the record high touted in Iconix's press release.

62.     Iconix's press release also touted the achievement of "[r]ecord Q3 revenue of $113.8 million, a 6% increase over prior year quarter."  This was false and misleading in light of the $6 million in false revenue recognized in the third quarter.

63.     The press release reported net income for the quarter of $37.2 million, an increase over the prior year, and net income for the first nine months of 2014 of $138.8 million, also a considerable increase over the same period in 2013.

64.     Iconix's Form 10-Q, filed with the SEC on November 7, 2014, repeated the materially false and misleading statements contained in its press release.  In its Form 10-Q, Iconix falsely reported $113.8 million in revenue for the quarter and $348.8 million in revenue year-to-date.  Iconix's reported revenue for the quarter was inflated by over 5%.  By reporting this false revenue, Iconix was able to beat the analysts' consensus revenue estimate of $111.81 million by $1.94 million.

65.     Iconix's Form 10-Q reported $37.2 million in after-tax net income and $138.8 million in net income for year-to-date.  If Iconix had properly excluded the $6 million in false SEA III revenue from its financial results, then Iconix would have reported net income of approximately $34 million.  Iconix's Form 10-Q overstated net income for the third quarter by over 12%.

66.     Iconix's Form 10-Q contained a false and misleading description of the intellectual property rights transferred to Company 1 as part of the SEA III deal.  Iconix claimed that: "[i]n return, [Company 1] agreed to pay [Iconix] $21.5 million."  This was misleading, because Iconix failed to disclose that $6 million of this total represented an agreed-upon

overpayment, lacking in economic substance, which Iconix, through its then-CEO, had promised to send back to Company 1.

67.     This materially false and misleading statement was repeated in Iconix's 2014 Annual Report, filed with the SEC on Form 10-K on March 2, 2015, and again in Iconix's Form 10-Q for the first quarter of 2015, filed with the SEC on May 8, 2015.

**D.     Iconix's Materially False and Misleading Disclosures
of its 2014 Financial Results**

68.     Iconix also made false and misleading statements when reporting its 2014 financial results.

69.     On February 26, 2015, Iconix announced its 2014 results in a press release, which it filed with the SEC as an exhibit to a Form 8-K.  Iconix's press release touted annual revenue of over $461 million, beating the consensus revenue estimate of $459 million by approximately $1.4 million.  This was misleading, because if the $11 million in false revenue had properly been excluded, then Iconix would have reported approximately $450 million in revenue, and would have missed consensus estimates by approximately $9.59 million.  Given the importance placed by Iconix, analysts, and investors on meeting or beating consensus estimates, this was a material misstatement.

70.     Iconix's press release reported EPS of $2.78 for the year, beating the analyst consensus estimate of $2.76 by two cents.  This was misleading, because if Iconix had properly excluded the $11 million from revenues, and had properly excluded a $3.1 million payment (discussed below in ¶¶ 81-84), from expenses, then Iconix would have reported EPS of $2.74, missing the analysts' consensus estimate by two cents.  Given the importance placed by Iconix, analysts, and investors on meeting or beating consensus estimates, this was a material misstatement.

18

71.     On March 2, 2015, Iconix issued its 2014 financial statements in its annual report, filed with the SEC on Form 10-K.  Iconix's 2014 financial statements repeated the false revenue number from the press release, claiming that Iconix had achieved revenue of over $461 million for the year.

**E.      Iconix Concealed its Fraud through Fictitious Invoices and Repayments, False Responses to the SEC's Division of Corporation Finance, Destruction of Documents, and False Representations to its External Auditor**

*1.      Creation of Fictitious Invoices and Repayments*

72.     On September 26, 2014, in an effort to collect the SEA II overpayment that Iconix, through its then-CEO, had promised to give back, Company 1 sent three invoices to Iconix, totaling $5 million.

73.     Although the $5 million total exactly matched the amount of the SEA II overpayment, the invoice amounts greatly exceeded the value of the marketing services to which they purported to relate.

74.     The invoices were suspicious on their face, because, among other things, they were for large, round numbers, were payable upon receipt, and contained little description of any services rendered.  In addition, one of the invoices related to marketing for a brand that had nothing to do with SEA II.  *Bona fide* invoices that Iconix received from joint-venture partners, by way of contrast, typically were for non-round amounts corresponding to the actual value of services rendered, were not payable on receipt, and contained a description specifying that a verifiable service had been rendered.

75.     After the invoices were brought to his attention, Iconix's then-CEO directed its then-COO to obtain new invoices from Company 1 that addressed the suspicious red flags identified above.

19

76.     Both Iconix's then-CEO and its then-COO communicated with Company 1 executives to request new invoices.

77.     On October 2, 2014, Company 1 issued new invoices to Iconix for the same purported services.  The new invoices contained slight changes to the amounts (to avoid round numbers), more detailed descriptions of services purportedly provided, and a new invoice date of September 30.  There was no written agreement related to any of the services described in the invoices, and the invoiced amounts greatly exceeded the real value of any of the services described in the invoices.  Rather, the invoices were meant merely to paper over Iconix's payments of amounts due to Company 1 pursuant to the side agreements negotiated by Iconix's then-CEO.

78.     By late November 2014, Iconix had not paid the invoices.

79.     In meetings and via email, Iconix discussed internally and with Company 1 how to repay the full $11 million that Iconix had promised would be returned to Company 1.

80.     In November and December 2014, Iconix made a series of payments to Company 1, totaling over $5.3 million, which were purportedly pursuant to some of the October 2, 2014 invoices, as well additional invoices sent by Company 1.

81.     In addition, Iconix, through its then-CEO, negotiated a new joint venture with Company 1, through which the two companies would distribute certain Iconix-branded merchandise in the Middle East, Europe, and North Africa regions.  This deal, known within Iconix by the acronym "MENA," closed on December 24, 2014.

82.     As part of the MENA deal, Company 1 purchased an interest in a joint venture called "Iconix MENA" for $18.8 million.  In connection with that transaction, Iconix's then-CEO negotiated a written agreement with Company 1 whereby Iconix would give $3.1 million to

Company 1 in the form of "consulting fees" for a purported due diligence and marketing analysis of the Middle East and North Africa markets.

83.     This due diligence payment was false.  The $3.1 million price did not reflect any legitimate business expense, but instead was a vehicle to return $3.1 million to Company 1.

84.     On December 23, 2014, Iconix's then-CEO authorized Iconix to pay Company 1 $3.1 million for "ME JV formation costs," and Iconix paid $3.1 million to Company 1.

### 2.     *False Response to SEC's Division of Corporation Finance*

85.     On December 15, 2014, Iconix received a comment letter from the SEC's Division of Corporation Finance, as part of an SEC filing review of Iconix's 2013 annual report. In its letter, the Division of Corporation Finance inquired about certain accounting and reporting matters, including Iconix's accounting for international joint ventures, such as SEA II and SEA III.  On February 11, 2015, as part of the comment letter process, the Division of Corporation Finance sent Iconix another letter seeking additional information about international joint ventures.

86.     Iconix's then-CEO and then-COO led a group of Iconix officers, employees, and independent auditors who worked on formulating a written response to the Division of Corporation Finance inquiry, which was submitted to the SEC on February 24, 2015 and subsequently made available to the public via the SEC's EDGAR website.

87.     Iconix's response letter to the Division of Corporation Finance contained false and misleading statements.

88.     In its February 11, 2015 comment letter, the Division of Corporation Finance asked Iconix to "further explain to us the primary business purpose" of certain international joint-venture transactions, to "clearly explain the circumstances that lead to" each transaction,

and to "describe the circumstances leading to a decision to enter into each transaction, and identify the individual(s) who [are] responsible for negotiating and executing these transactions."

89.     At the direction of its then-CEO, Iconix's response was misleading.  Although Iconix identified reasons for entering into the SEA II and SEA III deals, it failed to state that the $5 million and $6 million overpayments enabled Iconix to beat consensus revenue and EPS estimates in the second and third quarters of 2014, and did not discuss Iconix's promise, through its then-CEO, to return $11 million to Company 1, making Iconix's recognition of that revenue improper.

90.     To insulate its then-CEO from scrutiny, Iconix's response letter also falsely stated that the SEA II and SEA III deals were "negotiated by" the then-COO and another executive "with guidance" from the then-CEO.  This was misleading, because Iconix's then-CEO was personally involved in negotiating key aspects of the fraudulent deals, including the overpayments and giveback elements.

### 3.     *Destruction of Documents*

91.     While Iconix was preparing its responses to the SEC's Division of Corporation Finance, Iconix's then-CEO directed the destruction of certain documents and emails related to the SEA II and SEA III transactions with Company 1.

92.     Iconix's then-CEO gave this instruction to obstruct any investigation that might arise as a result of the Division of Corporation Finance's inquiry.

93.     Both Iconix's then-CEO and its then-COO deleted relevant emails related to Company 1 and Iconix's fraudulent scheme.

### 4.     *Concealment from External Auditor*

94.     To conceal its scheme, Iconix, through its then-CEO, repeatedly provided false assurances to Iconix's external auditors in 2014 and 2015, representing, among other things, that

all material facts had been disclosed, that Iconix was not aware of any undisclosed fraud, and

that Iconix's financial statements were free of material misstatements or omissions and fairly

presented the company's financial results.

## IV.   FROM 2013 THROUGH THE THIRD QUARTER OF 2015, ICONIX NEGLIGENTLY ENGAGED IN AN IMPROPER ACCOUNTING AND REPORTING FRAUD BY FAILING TO WRITE OFF UNCOLLECTIBLE RECEIVABLES AND TO WRITE DOWN IMPAIRED INTANGIBLE ASSETS

95.     Between 2013 and the third quarter of 2015, Iconix negligently violated the

antifraud, reporting, books and records, and internal accounting controls provisions of the federal

securities laws through two principal sets of actions.  *First*, Iconix negligently accounted for and

reported transactions with two licensees, Company 2 and Company 3, by unreasonably failing to

write off uncollectible receivables and failing to properly account for and disclose transactions

undertaken to bolster the finances of the licensees.  Iconix's improper accounting and reporting

masked the fact that demand for and market acceptance of the branded apparel sold by these

licensees had waned.  *Second*, Iconix unreasonably failed to write down three brands—Brand 1,

Brand 2, and Brand 3—as impaired, despite clear indicators of impairment, and instead

undertook a number of transactions, which were not sufficiently disclosed and for which Iconix

improperly accounted, to prop up the impaired brands.

### A.     Iconix's Negligent Accounting and Reporting for Transactions with Two Distressed Core Licensees

96.     By at least early 2013, Iconix was on notice that Iconix's core licensee for Brand

1, Company 2 (a related entity in which Iconix held a 16.67% interest and over which it

exercised significant influence under ASC 323), and its core licensee for Brand 2, Company 3,

were not current on their royalty obligations to Iconix and were financially insolvent.

97.     Under ASC 310, "[a]n impairment of receivables shall be recognized when, based

on all available information, it is probable that a loss has been incurred based on past events and

conditions existing at the date of the financial statements."  ASC 310-10-35-9 subtopic 450-20

requires recognition of a loss when both of the following conditions are met: (i) information

available indicates that it is probable that a receivable has been impaired, and (ii) the amount of

the loss can be reasonably estimated.

98.     In contravention of GAAP, Iconix unreasonably failed to write off the amount of

the Brand 1 and Brand 2 uncollectible receivables or to create an allowance for bad debt in

connection with the uncollectible past-due royalties.

99.     Instead, as further detailed below, Iconix entered into transactions with these

licensees that masked the growing uncollectible receivable balances.  Iconix purchased from the

majority owner of Company 2 an indirect 5% interest in a company that was owned in part by

the majority owner of Company 2 and purchased from Company 3 a 49% interest in a

consolidated subsidiary that held Brand 2.  In these deals, Iconix paid the majority owners of

Company 2 and Company 3 a higher acquisition price, which resulted in an extra $10 million

and an extra $20 million in funds being provided by Iconix to Company 2 and Company 3,

respectively, so that the core licensees, Brand 1 and Brand 2, could pay debts, including past-due

and future royalties, to Iconix.  Iconix's accounting for and reporting of these transactions were

materially false and misleading.

### 1.     *Iconix Failed to Write Off Uncollectible Company 2 Receivables*

100.    Throughout 2012 and 2013, Iconix was aware of several factors that should have

caused it to recognize a loss, under ASC 310, on uncollectible receivables owed by Company 2

under its licensing agreement.

101.    By August 2012, Company 2 stopped making any royalty payments to Iconix,

despite a requirement to pay guaranteed minimum royalties.  In 2013, Company 2 continued in a

state of delinquency and was on the verge of bankruptcy. By the beginning of the third quarter of 2013, Iconix carried an approximately $5 million receivable balance, reflecting past-due royalties owed to Iconix by Company 2.

102.    Iconix unreasonably failed to write off the Company 2 receivables as uncollectible or to create an allowance for bad debt as required by ASC 310.

103.    Iconix continued to improperly carry the receivable balance and failed to disclose to investors, through its public SEC filings, that it was probable that the receivables were impaired and that the amount of the loss could be reasonably estimated.

104.    Instead, in July 2013, Iconix entered into a $40 million acquisition transaction with an enterprise founded and partly owned by the majority owner of Company 2, referred to herein as "Company 4." In this transaction, Iconix overpaid by $10 million—$2.7 million of which was returned to Iconix as past-due royalties owed by Company 2. In its Form 10-Q for the third quarter of 2013, filed publicly with the SEC, Iconix disclosed that it paid: $32 million to buy 10% of a company, referred to herein as "Company 5," which owned half of Company 4;[4] and $8 million to Company 4 in connection with the launch of a so-called Brand 1 "Diffusion Brand."

105.    In reality, only $22 million of the $32 million paid by Iconix for its share of Company 5 reflected the purchase price—not $32 million as disclosed. The extra $10 million was used to pay off various creditors of Company 2—including $2.7 million paid to Iconix in order to satisfy Company 2's past-due royalty payment obligations to Iconix.

---

[4] Through this deal, Iconix technically purchased an 18.2% interest in another LLC that was a then-newly-created affiliate of Company 5. This provided Iconix with a 10% share of Company 5 and, indirectly, with a 5% ownership interest in Company 4. To this day, Iconix owns a minority share of the LLC.

106.    Iconix's conduct was unreasonable.  Iconix should have known that Iconix was slated to incur a loss on its investment based on Company 4's performance projections and that Iconix was effectively capitalizing Company 2 through this deal, ensuring that approximately $2.7 million in royalties would be paid back to Iconix.

107.    In its filings with the SEC for 2013, 2014, and the first three quarters of 2015, Iconix unreasonably failed to correctly account for and report these economic realities.  Iconix's books and records for this period also contained several material accounting errors, including: (i) the failure to write off Company 2's accounts receivable as uncollectible; (ii) an overstatement of the amount of Iconix's investment in an LLC directly affiliated with Company 5 and indirectly with Company 4 and a corresponding understatement of the amount of Iconix's capitalization of Company 2; (iii) the failure to recognize Iconix's share of losses from its investment in Company 2, which was required by the equity method of accounting[5]; and (iv) an overstatement of revenue received from Company 2 due to the $2.7 million royalty payment to Iconix.  There was no reasonable basis under the applicable accounting standards for Iconix to have accounted for and reported this transaction in the manner in which it did.

### 2.    *Iconix Failed to Write Off Uncollectible Company 3 Receivables*

108.    By the second quarter of 2013, Iconix had issued a series of default notices to Company 3 and was aware that Company 3's lender was seeking a default against Company 3. Iconix issued default notices in February, May, and November 2012 and February 2013

---

[5] Iconix unreasonably failed to disclose transactions with Company 2 as related party transactions pursuant to ASC 850 and Rule 4-08(k) of Regulation S-X.  In addition, under ASC 323, a 5% or more investment in a limited liability company (such as Company 2) is generally accounted for under the equity method of accounting.  Here, since Iconix owned 16.67% of Company 2, Iconix should have accounted for its investment under the equity method, particularly since Iconix had the ability to (and did) exercise significant influence over the operating and financial policies of Company 2.

notifying Company 3 that it was in default on over $11.4 million in required Brand 2 royalty payments.

109.    Under ASC 310, Company 3's financial distress—particularly when coupled with a trend of declining sales—made it probable that Company 3's past-due receivable would not be collected.  The amount of the loss was readily estimable.

110.    Iconix acted unreasonably by failing to write off Company 3's past due receivable or create an allowance for bad debt.

111.    Instead, Iconix used its own money to pay off Company 3's past-due receivable, causing Iconix's net income after taxes to be materially overstated by 16.3%.  In May 2013, Iconix purchased the remaining 49% interest that Company 3's owner held in a consolidated subsidiary that held Brand 2 and awarded Company 3 a new license for Brand 2 with amended terms for the rest of 2013 and 2014.

112.    In disclosures concerning this deal, Iconix stated that it paid $45 million for Company 3's minority interest in a consolidated subsidiary that held Brand 2.

113.    But, as set forth in the final acquisition agreement (which was not disclosed to the public), Iconix earmarked—and then used—$20 million of its supposed $45 million purchase amount to provide Company 3 with funds to pay to Iconix past due and prepaid royalties under Company 3's new license.

114.    The acquisition agreement further reflected that Iconix's $20 million payment included $9 million in past-due royalties that Company 3 owed to Iconix and $11 million in prepaid royalties that would be owed for the remainder of 2013 and all of 2014 under the terms of Company 3's new licensing agreement.

115.     As additionally prescribed by the acquisition agreement, Iconix did not pay the $20 million to Company 3, but instead paid the $20 million directly to itself through subsidiaries that Iconix owned.  Iconix did not disclose this in any filings with the SEC.

116.     Rather, although Iconix's filings with the SEC described the Company 3 transaction, its public filings did not disclose that $20 million of the $45 million payment amount was designated to be returned to Iconix for the purpose of covering Company 3's royalty obligations to Iconix.  Accordingly, Iconix's relevant SEC filings created the misleading impression that the purchase price Iconix paid to Company 3 in the transaction represented money that was being spent to acquire Company 3's interest in the Iconix subsidiary, and that royalty revenue recognized by Iconix from Company 3 stemmed from Company 3's actual operations.

117.     Iconix's SEC filings created the false and misleading impression that Iconix was making a *bona fide* arms-length purchase of Company 3's minority interest in Brand 2 at the stated price and that royalties paid to Iconix by Company 3 reflected Company 3's actual economic activity and performance.

**B.     Iconix Negligently Failed to Impair Three Brands and Instead Improperly Accounted for and Reported Transactions That Artificially Bolstered the <u>Apparent Health and Market Acceptance of the Brands</u>**

118.     During the relevant period, Iconix aggregated the amount of its brands in a single line item for intangible assets within its financial statements.

119.     Pursuant to ASC 350, an intangible asset is impaired when its carrying amount exceeds its fair value.[6]  ASC 350 provides that intangible assets on a company's balance sheet

---

[6]  ASC 820 defines fair value as the price that would be received to sell an asset or to transfer a liability in an orderly transaction between market participants at the measurement date.

are subject to testing for impairment "whenever events or changes in circumstance indicate that the asset might be impaired." Under GAAP, indicators of impairment include adverse changes in the business climate or market that might negatively impact the value of an intangible asset.

120.     During the relevant period, an Iconix training document identified "[a] significant adverse change in … the business climate," "[l]oss of significant licensee," and "[l]oss of key personnel" as relevant triggering events for impairment.

121.     By the third quarter of 2013, Iconix was presented with clear indicators that three of its brands—Brand 1, Brand 2, and Brand 3—were impaired, including:

a.     Loss of significant licensees;

b.     Loss of key personnel;

c.     Distressed financial condition;

d.     Brands lacked customer demand; and

e.     The need for Iconix to provide licensees with cash liquidity to improve their financial position and ensure that licensees could make required royalty payments (an indicator that the licensees could not meet minimum royalty payments or sell the brands).

122.     Instead of properly considering these indicators of impairment and conducting timely impairment testing, as required under ASC 350, Iconix made payments to or otherwise invested in its licensees for Brand 1 and Brand 2, further concealing their poor financial condition. With respect to Brand 3, Iconix ignored the absence of sales and future prospects. Through these actions, and through its improper accounting and reporting for transactions with these brands, Iconix unreasonably hid the true financial condition of the brands and their core licensees from investors, and unreasonably failed to timely recognize impairment losses in 2013.

Iconix continued to overstate the carrying amounts of these intangible assets on its balance sheet in 2014 and during the first three quarters of 2015.

123.     As a result of its unreasonable failure to impair these assets, as detailed below, Iconix carried these three brands at amounts hundreds of millions of dollars higher, collectively, than their true fair market values, materially impacting Iconix's 2013 and 2014 balance sheets and reporting.

### 1.     *Iconix Unreasonably Failed to Impair Brand 1 in 2013*

124.     By the third quarter of 2013, Iconix knew that it was going to lose its core Brand 1 licensee, Company 2, and further knew that Iconix's $10 million contribution to Company 2 (detailed above in ¶¶ 99, 104-07), offered the licensee only a temporary lifeline, not a solution to its long-term problems.

125.     The indicators of impairment for Brand 1 of which Iconix was aware by the third quarter of 2013 included declining sales, lack of customer demand, inability to finance operations (such as sales and design), and inability to make payroll (*i.e.*, near insolvency), and Iconix's need to fund royalty payments.

126.     Despite being on notice of these impairment indicators, Iconix unreasonably accepted projections of Brand 1's performance that were prepared by an Iconix executive, which unreasonably bolstered the value of Brand 1.  This error caused Iconix's 2013 year-end impairment testing and disclosures around impairment to be inaccurate, and was further compounded by Iconix's application of excessive, year-over-year growth rates and growth projections for certain licensees of Brand 1, and Iconix's improper consideration of Diffusion Brand sales projections as Brand 1 royalties.  Iconix used an unreasonably high, year-over-year growth trajectory (ranging from a high of 825% in 2015 to a low of 26% in 2018) for projections for a Diffusion Brand licensee that was a start-up with little or no operations.

30

127. Iconix also projected that another Brand 1 licensee (referred to herein as the "Factory Liaison") that received a license just before the impairment testing process began, and that was a start-up with no history of owning or licensing brands, would pay between 88% and 578% more in Brand 1 royalties each year from 2014 through 2017 than the royalty targets listed in its license. Iconix acted unreasonably by failing to recognize that these royalty and growth projections did not reasonably correlate to actual sales and in failing to verify that the impairment testing was supported by past brand performance.

128. On December 16, 2013, Iconix agreed to contribute $3 million to Company 2, and Company 2's majority owner agreed to match that investment. Iconix's investment, together with the matching investment from Company 2's majority owner, prevented Company 2 from going bankrupt before Iconix finished its 2013 year-end impairment testing and ensured that Iconix would have a core licensee (Company 2) in place for its 2013 year-end impairment testing if Iconix could not find a replacement core licensee by then.

129. Although Iconix disclosed its $3 million investment as a contribution to the cash collateral pool relating to Company 2's financing arrangements in Iconix's 2013 annual report, Iconix did not disclose that the purpose of the investment was to artificially delay the demise of Company 2 beyond Iconix's year-end impairment testing and avoid an impairment write-down of Brand 1. Iconix also promised to work with Company 2 if Company 2 did not pay its remaining royalties, and to not put it into bankruptcy. This promise was not disclosed to investors.

130. As a result of this negligence, Iconix incorrectly reported the amount of its intangible assets in its 2013 financial statements, filed with the SEC on Form 10-K on February 27, 2014. Iconix reported the total carrying amount of its trademarks and intangible assets as

$1.77 billion, which included a $202.7 million carrying amount for Brand 1.  If Iconix had used reasonable assumptions and applied accounting standards in a reasonable manner, then it would have recognized an impairment loss of approximately $132.7 to $142.5 million to the value of Brand 1 in 2013, writing down Brand 1 to a fair market value of approximately $60 to $70 million.

### 2.     *Iconix Unreasonably Failed to Impair Brand 2 in 2013*

131.    By the second quarter of 2013, Iconix was aware of indicators of impairment for Brand 2.  As of that date, Iconix already had sent multiple default notices to Brand 2 and was aware that a lender to Company 3 (for which Brand 2 was a core licensee) had threatened to seek default.  In addition, Iconix had engaged in a transaction with Company 3 (described above in ¶¶ 99, 111-16) that was structured to provide additional funding for royalty payments due to Iconix. Iconix also was aware that Company 3's longtime CEO intended to leave Brand 2's licensing business, a loss of key personnel.

132.    Rather than considering these indicators of impairment and timely conducting impairment testing in the third quarter of 2013, Iconix instead engaged in transactions (for which it improperly accounted and reported) that concealed Brand 2's impairment from investors.

133.    In September 2013, as the end of the quarter was approaching, Iconix awarded a license for a specialty line of Brand 2 (the "Brand 2 Specialty Line") to another start-up company (the "Specialty Licensee").  Later, during its mandatory year-end impairment testing, Iconix included unreasonable and unsupported projections for the Brand 2 Specialty Line in its impairment test for Brand 2.

134.    At the same time that Iconix awarded this license, Iconix purportedly invested $25 million in a media company that was owned in part by one of the owners of the Specialty

Licensee.  Three million of Iconix's purported $25 million investment amount would, as a mandatory feature of the deal, be used to capitalize the Specialty Licensee.

135.    Iconix disclosed this deal as a $25 million purchase in its financial reports, stating that it had "purchased…an…interest in [the media company]…for $25 million," and that its net cash used in investing activities increased "due to…our investment in [the media company] for $25.0 million."  Iconix unreasonably omitted to disclose that $3 million would be passed through to the Specialty Licensee to support Brand 2.

136.    Iconix acted unreasonably with regard to this capital infusion, which should have reasonably led Iconix to question whether Brand 2 would be able to meet its growth projections, given its continuing need for cash infusions.  Additionally, once the Specialty Licensee became operational, Iconix paid money to retailers to benefit this licensee's business, but unreasonably failed to offset revenue by the amount of the retail payments.  Iconix also improperly projected that the Specialty Licensee would, in year one of its license, pay 60% *more* than the royalty target in its contract and that this licensee would subsequently experience year-over-year growth in its royalties of 6% to 9% *more* than the inflated year-one estimate.  This was unreasonable in light of Iconix's capital infusion and retailer payments.

137.    Iconix's transactions with the Specialty Licensee, taken collectively with the impairment indicators presented by the buyout deal involving Company 3, were additional red flags for impairment.

138.    The performance projections that Iconix used for Company 3 in its impairment testing at the end of calendar year 2013 were not reasonable, because:  (i) Iconix effectively made a $20 million royalty payment to itself through an undisclosed earmarked amount in the purchase price for Company 3's interest in the subsidiary that held Brand 2; (ii) Company 3 was

on the verge of bankruptcy; and (iii) Company 3's new license of Brand 2 after the buyout deal did not extend past 2014.

139.     Iconix's 2013 impairment test nevertheless projected that Company 3 would continue to pay between $5.2 million and $6.2 million in Brand 2 royalties each year through 2018.

140.     As a result of this negligence, Iconix incorrectly reported the amount of its intangible assets in its 2013 financial statements, filed with the SEC on Form 10-K on February 27, 2014.  Iconix reported the carrying amount of its trademarks and intangible assets as $1.77 billion, which included a $176.7 million carrying amount for Brand 2.  If Iconix had used reasonable assumptions and applied accounting standards in a reasonable manner, then it would have recognized an impairment loss of approximately $106.7 to $116.7 million to the value of Brand 2, writing down Brand 2 to a fair market value of approximately $60 to $70 million.

### 3.     *Iconix Continued to Carry Brand 1 and Brand 2 at Overstated Amounts in 2014*

141.     By early 2014, Iconix also signed a new core licensee for Brand 1 and Brand 2. The new core licensee was one of three companies controlled by a single individual, collectively referred to herein as "the Factory Liaison."  At the time, the Factory Liaison had few operations and no prior history of owning or licensing any brands.

142.     Iconix executives internally discussed the new core licenses held by the Factory Liaison as an effort, in 2014, to avoid triggering impairments to the values of the Brand 1 and Brand 2 intangible assets.  This is because the new Factory Liaison licenses enabled Iconix to set-up a short-term solution—that is, replacing Company 2 and Company 3 as the core licensees for Brand 1 and Brand 2.

143.     From the start of the relationship with the Factory Liaison—which included two consecutive Brand 1 licenses and one Brand 2 license—Iconix was on notice of the presence of indicators of impairment, but unreasonably failed to conduct impairment testing or, as properly conducted impairment testing would have shown was necessary, to recognize impairment losses on Brand 1 and Brand 2 intangible assets.

144.     In a manner inconsistent with its "asset light" business plan, Iconix also assumed many operational responsibilities in 2014 for the Factory Liaison with respect to Brand 1, such as sales and design, because the Factory Liaison was unable to fulfill these responsibilities.

145.     Although the Factory Liaison was not meeting the sales targets in its first Brand 1 license (and Iconix overstated revenue from this arrangement in 2014), on December 23, 2014, Iconix nevertheless awarded the Factory Liaison a new Brand 1 license, with even higher sales targets, to replace the first contract.  On its face, the second Brand 1 license obligated the Factory Liaison to pay higher royalties than those in its first license, and it required the Factory Liaison to take over sales and design functions for Brand 1.  Iconix reasonably should have questioned whether the Factory Liaison would be able to meet these obligations without further financial support from Iconix, based on the Factory Liaison's limited experience and capital, and the weak start to its relationship with Iconix.

146.     Moreover, on the day the second Brand 1 license was awarded, Iconix paid the Factory Liaison $6 million.  This $6 million payment was purportedly paid to acquire 51% of a denim brand owned by the Factory Liaison.  The Factory Liaison had acquired the denim brand approximately two months earlier for a total of $1 million in cash and $1 million in assumed liabilities.

147.    Iconix and the Factory Liaison understood that Iconix's $6 million investment would be used to support the Factory Liaison's operational costs, and that the Factory Liaison therefore would use the payment to indirectly fund its royalty obligations to Iconix.

148.    Iconix did not disclose that its denim brand acquisition was a means to direct cash to the Factory Liaison for its Brand 1 operations.  Instead, Iconix's SEC filings stated only that it "paid $6.0 million…in exchange for a 51% controlling ownership" of a holding company to which the denim brand was contributed.

149.    Iconix also did not enforce the Factory Liaison's royalty obligations as set forth in the second contract.  Iconix therefore overstated revenue from this licensee in its books and records by at least $3.5 million in 2014 and by $170,000 in 2015.

150.    Iconix also paid at least $1.024 million in retailer charges for the Factory Liaison in 2014.  In 2015, Iconix paid $976,000 in such retailer charges on behalf of the Factory Liaison. Iconix unreasonably failed to net these payments against revenue on its income statement. Moreover, the need for Iconix to pay these charges evidences the Factory Liaison's lack of financial wherewithal to deliver strong royalty revenues.

151.    Despite these signs that the Factory Liaison would have difficulty making its royalty payments without financial assistance, and the Factory Liaison's failure to meet its minimum contractual royalty payments in the first year of its license, in its 2014 impairment testing, Iconix unreasonably projected that the Factory Liaison would—each year between 2014 and 2017—pay substantially more Brand 1 royalties than required under the guaranteed minimums in its license.  For example, Iconix projected that for one of those years, the Factory Liaison would pay royalties that were 578% above the amount in its license.  These projections were inconsistent with economic reality and had no basis in past performance.

152.    Iconix's 2014 impairment testing also unreasonably projected that the Factory Liaison would pay $15.3 million in Brand 1 royalties to Iconix in 2018, even though the Factory Liaison's license was scheduled to expire in 2017.  Given the difficulty that Iconix had experienced in finding a core licensee for Brand 1, and given the concessions—in the form of financial support, provision of design and sales services, and not enforcing guaranteed minimums—that Iconix had made to the Factory Liaison to sign it as a core licensee, it was unreasonable for Iconix to project both that it would sign a core licensee for 2018 and that it would realize such healthy royalty revenues.

153.    Iconix's 2014 impairment testing also included unreasonable projections for Brand 1 for the Factory Liaison in light of the capital infusion that Iconix provided to the Factory Liaison through the denim brand acquisition.

154.    Iconix acted unreasonably with respect to its 2014 impairment testing for Brand 1 and Brand 2, including by relying on unreasonable future revenue projections from these licensees in its mandatory annual impairment testing.  As a result of this negligence, Iconix incorrectly reported the amount of its intangible assets in its 2014 financial statements, filed with the SEC on Form 10-K on March 2, 2015.  Iconix reported the carrying amount of its trademarks and intangible assets as $1.95 billion, and improperly continued to carry Brand 1 and Brand 2 at their inflated 2013 levels.  Iconix continued to carry Brand 1 and Brand 2 at their inflated 2013 levels through the third quarter of 2015.  If Iconix had used reasonable assumptions and applied accounting standards in a reasonable manner, then it would have carried Brand 1 and Brand 2 at their fair market value of approximately $60 to $70 million each.

### 4.    *Iconix Unreasonably Failed to Impair Brand 3 in 2013 and 2014*

155.    By at least early 2013, Iconix was aware of indicators of impairment for Brand 3. As of that date, Brand 3 had not recognized *any* revenue in 2012 or 2013 and Iconix was unable

to locate any licensee for Brand 3 that could make royalty payments sufficient to support the carrying amount of the asset.

156.    Iconix unreasonably failed to consider these indicators of impairment and timely conduct impairment testing in the third quarter of 2013.

157.    If Iconix had conducted timely impairment testing, then it would have concluded that Brand 3 was impaired as of the third quarter of 2013.

158.    As a result of this negligence, Iconix incorrectly reported the amount of its intangible assets in its 2013 financial statements, filed with the SEC on Form 10-K on February 27, 2014.  Iconix reported the total carrying amount of its trademarks and intangible assets as $1.77 billion, which included a $9.5 million carrying amount for Brand 3.  If Iconix had used reasonable assumptions and applied accounting standards in a reasonable manner, then it would have recognized an impairment loss of approximately $8.5 million, writing down Brand 3 to a fair market value of approximately $1 million in 2013.

159.    Iconix continued to overstate the carrying amount of Brand 3 on its balance sheet in 2014 and the first three quarters of 2015.  Specifically, because Iconix acted unreasonably with respect to its 2014 impairment testing for Brand 3, Iconix continued to carry Brand 3 at its incorrect 2013 carrying amount in Iconix's Form 10-K for fiscal year 2014, filed with the SEC on March 2, 2015, and during the first three quarters of 2015.

***

160.    In sum, Iconix unreasonably failed to timely conduct impairment testing and record an impairment loss on Brand 1, Brand 2, and Brand 3 and continued to overstate the carrying amounts of these brands between 2013 and the third quarter of 2015, causing its SEC filings and accounting records during this period to be materially false and misleading.

161.    As summarized in the chart below, if Iconix had employed reasonable revenue projections and had applied the accounting standards in a reasonable manner, then it would have recognized impairments to Brand 1 and Brand 2 in 2013 by over $132.7 million and $106.7 million, respectively, as well as an $8.5 million impairment to Brand 3:

|  | Brand 1 | Brand 2 | Brand 3 |
|---|---|---|---|
| Carrying Amount | $202.7 million | $176.7 million | $9.5 million |
| Fair Market Value | $60 to $70 million | $60 to $70 million | $1 million |
| Impairment Loss | $132.7 to $142.7 million | $106.7 to $116.7 million | $8.5 million |

162.    Conditions did not improve in 2014, and the amounts of Brand 1, Brand 2, and Brand 3 remained unreasonably overstated on Iconix's balance sheet.

### C.    Iconix Received Money or Property as a Result of its Negligent Fraud on Investors

163.    Iconix received money or property as a result of its negligent fraud on investors.

164.    Between 2013 and the third quarter of 2015, Iconix's stock price was positively impacted by its fraud.  Due to its unreasonable failure to write off the Company 2 and Company 3 receivables and its unreasonable failure to impair the Brand 1, Brand 2, and Brand 3 intangible assets, Iconix's stock traded at an inflated price between 2013 and the third quarter of 2015.

165.    During this same period, Iconix made stock offerings and obtained money or property through those offerings.  Iconix's Form 10-K/A for the year ended December 31, 2015, filed with the SEC on April 4, 2016, contains a Cash Flow Statement that shows that Iconix received proceeds from stock option exercises and/or warrant exercises in 2013, 2014, and 2015.

166.    Iconix's Form 10-K/A also discloses that, in March 2015, it used stock, the price of which was artificially inflated due to the fraud, to pay for a 50% interest in a Chinese subsidiary.

167.    The amount of money Iconix received through these transactions during the relevant period was inflated due to its fraud.

## V.    ICONIX'S MATERIAL ACCOUNTING ERRORS

168.    As a result of the sham, round-trip transactions in which Iconix knowingly, or at least recklessly, engaged (*see* Section III, *supra*), Iconix unreasonably failed to make and keep books and records that accurately reflected the transactions of the company.

169.    Among other accounting errors, Iconix's books and records materially overstated its net income (a metric closely watched by analysts and investors) for the second quarter and third quarter of 2014 and fiscal year 2014, as summarized in the table below:

| | Q2 2014 | Q3 2014 | Q4 2014 | FYE 2014 |
|---|---|---|---|---|
| Reported Revenue | 118.94 | 113.8 | 112.41 | 461.24 |
| Analyst Revenue Consensus Estimate | 117.08 | 111.81 | 111.13 | 459.83 |
| Actual Revenue excluding SEA II and SEA III | 113.94 | 107.75 | 112.41 | 450.24 |
| Met (Missed) Consensus Revenue Due to SEA II and SEA III | (3.14) | (4.06) | | (9.69) |
| Impact of SEA II and SEA III as a % of Net Income After Taxes | -8.96% | -12.37% | | -1.52% |

170.    As a result of Iconix's unreasonable failure to write off uncollectible receivables and to write down impaired intangible assets, as well as the myriad transactions in which Iconix engaged that concealed the distressed financial condition of certain brands and licensees, Iconix's books and records for 2013 through the third quarter of 2015 materially misstated net income (a metric closely watched by analysts and investors), as summarized in the tables below:

| | | Impact on Net Income Before Taxes | | |
|---|---|---|---|---|
| ACCOUNTING ERRORS | Cmplt. Cite | 2013 | 2014 | 2015 |
| **IMPAIRMENT LOSS** | § IV.B | | | |
| *Brand 1* | ¶¶ 124-26, 130, 152-54 | (132,700,000) to (142,700,000) | | |
| *Brand 2* | ¶¶ 131-32, 139-40, 152-54 | (106,700,000) to (116,700,000) | | |
| *Brand 3* | ¶¶ 155-59 | (8,500,000) | | |

|  |  | Impact on Net Income Before Taxes | | |
| --- | --- | --- | --- | --- |
| **ACCOUNTING ERRORS** | **Cmplt. Cite** | **2013** | **2014** | **2015** |
| **OTHER ACCOUNTING ERRORS** | | | | |
| *Company 2* | | | | |
| Loss from Uncollectible Receivables | ¶¶ 3, 100-02 | (5,414,000) | | |
| Overstated Revenue | ¶ 107(iv) | (1,088,000) | | |
| Equity Method Loss pick up | ¶¶ 96, 107(iii) & n.5 | (2,826,000) | | |
| *Company 3* | | | | |
| Overstated Revenue | ¶¶ 114-17 | | (1,496,000) | |
| Loss from Uncollectible Receivables | ¶¶ 3, 108-10 | (9,039,000) | | |
| ***The Specialty Licensee*** | | | | |
| Markdown Allowances | ¶ 150 | (1,000,000) | (867,000) | |
| ***The Factory Liaison*** | | | | |
| Overstated/Understated Revenue Related to Initial Brand 1 License | ¶ 149 | | (3,586,000) | 1,100,000 |
| Markdown Allowances Related to Brand 1 | ¶ 150 | | (1,024,000) | (976,000) |
| Overstated Revenue Related to Second Brand 1 License | ¶ 149 | | | (1,270,000) |

171.    Accordingly, Iconix unreasonably failed to make and keep books and records that accurately reflected the transactions of the company between 2013 and the third quarter of 2015.

## VI.    ICONIX'S DEFICIENT INTERNAL ACCOUNTING CONTROLS

172.    During the relevant period, Iconix's corporate culture, tone at the top, and deficient internal accounting policies, procedures, and training created an environment in which accounting improprieties, particularly with regard to impairment, were likely to occur.

173.    Iconix failed to implement internal accounting policies, procedures, or controls reasonably designed to identify indicators for impairment and to cause the company to conduct appropriate and timely impairment testing.

174.    Iconix did not identify any group or individual in the company as responsible for recognizing indicators of impairment or provide sufficient training on impairment accounting.

175.    Instead, Iconix assumed that any material events, including those bearing on impairment, would "bubble up" at *ad hoc* meetings between executives and brand managers. This assumption was unreasonable, since these meetings were not focused on impairment, but

also included revenue and budget discussions, and no specific training or instruction was provided to key participating executives on identifying indicators of impairment or impairment accounting.

176.    Iconix's finance function relied on Iconix's then-CEO and then-COO to timely provide them with key information—including assessments of future royalty projections and the licensees' ability to sell Iconix's brands—and to flag potential impairment issues for further review.

177.    Iconix did not have a process in place to require the then-CEO and then-COO to provide key impairment information to the finance function.  Nor did Iconix have in place internal policies and procedures setting out a process for verifying and testing the reasonableness of information, if any, provided.

178.    Iconix did not have in place internal accounting controls that required it to consider the indicators of impairment present in 2013 and 2014, which resulted in its unreasonable failure to properly test for impairment and to timely write-down the amount of the intangible assets associated with its brands.

179.    It was widely known throughout Iconix that the then-CEO exerted undue pressure on other members of management to find ways to avoid impairment.

180.    Iconix's former-CEO advised one senior member of the finance function that "the I-word" (*i.e.*, impairment) has never happened to the company.  The then-CEO made clear that impairment was an area of concern, because of the potential adverse impact on stock price of taking an impairment.

181.    In addition, Iconix's former-CEO created a culture in which other members of management did not feel comfortable raising objections or concerns, including through threats to their careers.

## VII.    THIS ACTION IS TIMELY FILED

182.    Iconix has entered into agreements with the SEC in which it agreed to toll, for various periods and lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  Collectively, Iconix's tolling agreements cover a two-year period.  This action is timely filed.

## VIII.   COOPERATION AND REMEDIATION

183.    Iconix cooperated with the SEC staff in connection with the SEC staff's investigation.  Iconix also implemented significant remedial measures, such as changes in management, corporate governance, and the remediation of internal controls deficiencies described herein.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder and Section 17(a)(1) of the Securities Act**

**(Scienter-Based Fraud)**

184.    Paragraphs 1 through 2, 6 through 94, and 182 are re-alleged and incorporated herein by reference.

185.    Iconix, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed any device, scheme, or artifice to defraud; (b) made untrue statement of a material fact, or omitted to state

any material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in any act, practice, or courses of business which operated or would operate as a fraud or deceit on any person.  In connection with the offer to sell or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, Iconix knowingly or recklessly used a device, scheme, or artifice to defraud someone.

186.    Iconix acted knowingly, with intent to defraud, and with reckless disregard for the truth.  Through the actions of its then-CEO and then-COO, whose knowledge is imputed to the company, Iconix designed and implemented a scheme to defraud Iconix shareholders, potential investors, and other members of the public by intentionally devising and executing sham transactions in order to deceive investors and analysts about Iconix's revenue and earnings.

187.    By negotiating and carrying out transactions in which Company 1 agreed to pay an inflated price on the understanding that a portion of the purchase price would be clandestinely returned to Company 1 in a later quarter, Iconix created the false appearance that Iconix was generating sufficient revenue to meet its earnings estimates.

188.    In some instances, these transactions were documented with a fictitious paper trail or partly premised on undisclosed side agreements.

189.    The fictitious revenue that Iconix recognized in connection with these transactions had a material impact on the company's reported quarterly revenue for the second and third quarters of 2014 and GAAP net income for year-end 2014.

190.    Based on these transactions, Iconix recorded over $11 million in false revenue, which was material to its financial reporting and ability to meet earnings consensus guidance in

the second and third quarters of 2014 and 2014 year-end, respectively (without which the company would have missed its earnings estimates).

191.     By virtue of the foregoing, Iconix violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

### (Negligence-Based Fraud)

192.     Paragraphs 1, 3 through 31, 95 through 167, and 182 are re-alleged and incorporated herein by reference.

193.     Iconix, in connection with the offer to sell or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly and with negligence, engaged in any transaction, practice, or course of business which operated or would have operated as a fraud or deceit on purchasers of Iconix's securities.

194.     Among other misconduct in furtherance of the fraud, detailed above, Iconix acted unreasonably and inconsistently with GAAP, and its conduct was inconsistent with that of a reasonable entity acting in the same role in like circumstances.  Iconix unreasonably failed to write off uncollectible receivables for Company 2 and Company 3, and instead engaged in transactions for which it improperly accounted and reported, and that were used to prop up the finances of Company 2 and Company 3's core licensees.

195.     Iconix also unreasonably failed to heed indicators of impairment and to write down Brand 1, Brand 2, and Brand 3 as impaired, resulting in its accounting and reporting for

impairment of intangible assets between 2013 to the third quarter of 2015 being materially false and misleading.  Iconix also engaged in myriad accounting improprieties and improper reporting with regard to certain transactions with Company 2, Company 3, the Factory Liaison, Brand 1, Brand 2, and Brand 3, all of which resulted in Iconix's unreasonably failing to recognize indicators of impairment, timely disclose impairment of certain if its intangible assets, and base its impairment determinations on accurate projections of performance.

196.    By engaging in the conduct described above, Iconix violated, and unless restrained and enjoined will again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2), (3)].

## COUNT III

### Violations of Exchange Act Section 13(a) and
### Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

### (Reporting Violations)

197.    Paragraphs 1 through 171 and 182 are re-alleged and incorporated herein by reference.

198.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of registered securities to file with the SEC accurate annual reports (on Form 10-K), quarterly reports (on Form 10-Q), and current reports (on Form 8-K).  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

199.    Iconix filed with the SEC annual reports on Forms 10-K for 2013 and 2014 and quarterly reports on Forms 10-Q for the second and third quarters of 2013, 2014, and 2015 that contained material misstatements.

200.    In these filings, Iconix materially misstated, among other things, the value of its intangible assets, revenue, net income, royalty accounts receivable, and cost of investment.

201.    Additionally, Iconix falsely stated that that its impairment testing complied with GAAP, and included material misstatements and omissions about its accounting and impairment testing.  For example, during the relevant period, certain deals were disclosed as revenue gains from the purchase price paid, without disclosing that the true purpose of the transactions was to recognize false revenue through artificially increasing the purchase price.

202.    Iconix also filed earnings releases on Forms 8-K that included material misstatements.  For example, Iconix's earnings release for the third quarter of 2014 falsely reported record-high revenue numbers for that quarter.  This metric was materially inflated.  The earnings release also included a materially false net income amount.

203.    By virtue of the foregoing, Iconix violated, and unless restrained and enjoined will again violate, Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13].

## COUNT IV

### Violation of Section 13(b)(2)(A) of the Exchange Act

### (Books and Records Violation)

204.    Paragraphs 1 through 171 and 182 are re-alleged and incorporated herein by reference.

205.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires that issuers make and keep books and records that accurately reflect the transactions of the company.

206.    Iconix violated Section 13(b)(2)(A) by failing to make and keep books and records that accurately reflected the transactions of the company, as evidenced by, among other misconduct, Iconix's:  (i) improper recognition of revenue from the sham transactions supported by fictitious invoices; (ii) failure to record a loss on its royalty accounts receivable accounts in connection with the certain transactions; (iii) concealment of losses through deals that included funds paid by Iconix being used to make royalty payments; and (iv) failure to write down the value of its intangible assets as impaired.

207.    By virtue of the foregoing, Iconix violated, and unless restrained and enjoined will again violate, Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)].

## COUNT V

### Violation of Exchange Act Section 13(b)(2)(B) and Rule 13a-15(a)

### (Internal Accounting Controls Violations)

208.    Paragraphs 1 through 182 are re-alleged and incorporated herein by reference.

209.    Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)] makes public companies responsible for devising and maintaining a system of internal accounting controls sufficient to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

210.    Exchange Act Rule 13a-15(a) [17 C.F.R. § 240.13a-15(a)] requires issuers to maintain disclosure controls and procedures and internal controls over financial reporting as defined in Rule 13a-15(f).

211.    Iconix failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded in accordance with management's general or specific authorization; that transactions are recorded as necessary to

permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; that access to assets is permitted only in accordance with management's general or specific authorization; and that the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

212.   Additionally, Iconix failed to implement internal controls surrounding impairment triggering events, such as designating personnel responsible for recognizing triggers and testing for impairment and training personnel on what factors constitute impairment triggers, which were critical to Iconix's ability to assess whether its intangible assets (its most valuable assets) were impaired and properly account for these assets.

213.   Instead, Iconix relied on an *ad hoc* process that waited for issues to "bubble up" based on meetings conducted by between personnel who were not trained to recognize indicators of impairment and that covered a broad range of issues, other than impairment, such as budget, revenue, and sales.

214.   Iconix lacked controls that connected the finance function—the group that was responsible for annual impairment testing—with the executives that were responsible for negotiating deals and meeting with licensees.

215.   Iconix also lacked controls that enabled finance personnel to independently verify the financial health of the company's licensees—a key triggering event.

216.   By virtue of the foregoing, Iconix violated, and unless restrained and enjoined will again violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78(b)(2)(B)] and Rule 13a-15(a) thereunder [17 C.F.R. § 240.13a-15(a)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

A.      Finding that Iconix violated the federal securities laws alleged in Counts I through V of the Complaint;

B.      Permanently restraining and enjoining Iconix, and all persons in active concert or participation with Iconix, from violating the federal securities laws alleged in the Complaint;

C.      Ordering Iconix to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

D.      Granting such other and further equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands a jury trial on all the issues so triable.

Dated: December 5, 2019

Respectfully submitted,

By:

Thomas A. Bednar*
Fernando Campoamor Sanchez*
Sarah H. Concannon (SDNY #SC-9111)

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone:  (202) 551-6218 (Bednar)
Facsimile:  (202) 772-9292
Email:  BednarT@sec.gov

*Attorneys for Plaintiff Securities and
Exchange Commission*

* *pro hac vice* application pending

Of Counsel:

Danette R. Edwards
Gregory G. Faragasso
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549